## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM TRIPODI, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 06-4071 |
| | : | |
| COASTAL AUTOMATION LLC, | : | |
| AND MACHINE DESIGN SERVICE | : | |
| INT'L, AND AUTOMATIC | : | |
| HANDING INT'L, AND MACHINE | : | |
| DESIGN SERVICE, INC., | : | |
| Defendants | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                   **July 31, 2008**

      While employed with Philadelphia Newspapers, Inc., William Tripodi injured his left hand and fingers in an open nip point of a conveyor system.  As a result, he filed this products liability action against the original manufacturer of the conveyor system, Machine Design Service, Inc., and three other entities that acquired the assets of Machine Design Service, Inc.[1]  Coastal Automation, LLC and Automatic Handling International filed a Rule 12(b)(6) motion to dismiss, which I denied.[2]  These defendants have now moved for summary judgment on the question of successor liability under Pennsylvania's "product line" exception.  Based on the reasons that follow, I will grant the motion as to

---

[1]By Order of March 26, 2007, Machine Design Service, Inc. and Machine Design Service International are no longer parties to the action (Document #14).

[2]See Tripodi v. Coastal Automation LLC, No. 06-4071, 2007 U.S. Dist. LEXIS 71852 (E.D. Pa. Sept. 26, 2007).

both Automatic Handling International and Coastal Automation, LLC.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[3]

On November 17, 2005, William Tripodi was injured while working at the Philadelphia Newspapers, Inc. facility in Conshohocken, Pennsylvania.  At the time of his injury, Mr. Tripodi was assigned to use a conveyor system, designed and manufactured by Machine Design Services, Inc., for the purpose of loading newspapers into delivery trucks.  While performing his duties, Mr. Tripodi's left hand and fingers became trapped in an open nip point of the conveyor system.  As a result, he suffered severe injuries.  In this products liability case arising from the November 17, 2005 incident, Mr. Tripodi alleges that Coastal Automation and Automatic Handling International are successors in interest to Machine Design Services, Inc., and are liable under Pennsylvania's product line exception to the general rule against successor liability.

A.   Ownership of Machine Design Services, Inc.

Prior to 2002, Machine Design Services, Inc., a Colorado company, manufactured and marketed a product known as the Model T-34 belt conveyor, the conveyor system used by Mr. Tripodi when he was injured at the Philadelphia Newspapers facility. According the deposition of Ronald Fransen, in 2002 a Michigan bank foreclosed on the assets of Machine Design Services, Inc. (See Fransen Dep. 7-8), and took possession of

---

[3]I have viewed the facts in the light most favorable to the non-moving party, Mr. Tripodi.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Machine Design Services' intellectual property assets including customer lists and

engineering drawings and layouts used to manufacture the Model T-34 belt conveyor (but

no actual equipment).

Automatic Handling Services, Inc. was a competitor of Machine Design Services,

Inc.  In 2002, David Pienta was majority owner of Automatic Handling Services, Inc. and

Ronald Fransen was a vice president in charge of sales and marketing.  The parties

dispute the manner in which Automatic Handling Services acquired Machine Design

Services' assets.  According to Mr. Fransen's deposition, Mr. David Pienta and Mr.

Fransen purchased Machine Design Services, Inc.'s "intellectual property" from the

Michigan Bank.  Mr. Daniel Pienta, president of defendant, Automatic Handling

International, submitted an affidavit stating that Automatic Handling Services acquired

"the intellectual property rights from Motion Systems for various conveyor machines."

(Pienta Aff. ¶ 2.)  Plaintiff interprets Daniel Pienta's affidavit to suggest that Automatic

Handling Services acquired the "intellectual property" rights of Machine Design Services

directly from Motion Systems, which Mr. Fransen testified was the "same company" as

Machine Design Services in 2002.  (See Fransen Dep. 30 ("[Y]ears before 2002, Motion

Systems sold out to a group of people, and they renamed it Machine Design . . . the

intellectual property was on two different types of paper, Motion Systems and Machine

Design.  It was both the same company, same products."); Pl.'s Supp. Opp'n Br. 4.)  Mr.

Fransen, on the other hand, testified that the assets were purchased from the Michigan

bank, and that to the extent Mr. Pienta's statement suggests otherwise, Mr. Pienta is "incorrect." (Fransen Dep. 30:24.) Beyond these two statements, neither party has submitted evidence pertaining to the acquisition of Machine Design Services' Model T-34 belt conveyor designs by Automatic Handling Services in 2002.

According to Mr. Fransen, "shortly after the purchase of the [Machine Design Services] intellectual property" Automatic Handling Services changed its name to Machine Design Services, Inc., to capitalize on the Machine Design "name notoriety within the newsprint industry." (Fransen Dep. 9:17-21.) At that time, Mr. Fransen was the president of the company and Mr. David Pienta was the majority owner. (See id. 10:7-10.) Mr. Fransen testified that Automatic Handling Services, renamed and now functioning as Machine Design Services, Inc., began offering Machine Design Services products for sale, including the Model T-34 belt conveyor. (See id. 10:11-24.) To Mr. Fransen's knowledge, however, the newly named Machine Design Services never sold a Model T-34. (See id. 10:24.) The product was marketed through "word of mouth during sales calls," and Mr. Fransen at most gave price quotes for the manufacture of a T-34 belt conveyor from the designs that his company had acquired. (See id. 11:4-9, 17-20.) Automatic Handling Services n/k/a Machine Design Services did not work with Philadelphia Newspapers, Inc. after the 2002 acquisition, and did not acquire the rights to manufacture spare parts for any existing Machine Design Services products, including the Model T-34. (See id. 12:3-6.)

4

Automatic Handling Services was formed in Ohio in 1999 or 2000.  (See id. 14:10-12.)  At that time, David Pienta also held majority ownership of a company called Automatic Handling International,[4] which manufactured and marketed roll handling equipment for the newspaper industry.  (See id. 14:18.)  When Automatic Handling International's Wisconsin Division "had some financial problems," Mr. Pienta offered Mr. Fransen the opportunity to form Automatic Handling Services with him, for the purpose of purchasing and marketing the roll handling equipment product line of Automatic Handling International.  (See id. 14:18-15:15.)

After purchasing the intellectual property of Machine Design Services, Inc. in 2002, Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., borrowed over $900,000.00 from Community First Credit Union.[5]  Part of the borrowed funds was used by Mr. Fransen and two other individuals to buy out David Pienta's shares of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., in 2004.  (See id. 19:12-16; Pienta Aff. ¶ 8.)  As a result of this buyout, Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., owed monthly payments to David Pienta for the use

---

[4]In his deposition, Mr. Fransen first states that Mr. Pienta held majority ownership, and then states he does not know Mr. Pienta's financial tie to Automatic Handling International, but that "his family owns the business."  (Fransen Dep. 15:22-16:16.)

[5]Mr. Fransen testified that his company, Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., opened an operating line of credit with Community First Credit Union toward the end of 2002 (roughly a year after acquiring the Machine Design intellectual property rights to the Model T-34), and continued to add to it over the years.  Later, in 2005, he found out that the loan was to be paid off after 90 days.  In order to obtain the line of credit, Mr. Pienta, Mr. Fransen, and all owners of Automatic Handling Services n/k/a Machine Design Services personally guaranteed the money.  (See Fransen Dep. 18:1-19:8.)

of the intellectual property of Automatic Handling International.  (See, e.g., id. 21:13-20

("At that time [January 2005] [Automatic Handling Services, Inc. n/k/a Machine Design

Services, Inc.] also, because of the outstanding bill to Automatic Handling International,

Mr. Pienta was calling asking for his money for the equipment that we had borrowed, or

that we had purchased from him, plus, we were still attempting to make that monthly

payment to Mr. Pienta for the intellectual property use."))

   In January 2005, Community First Credit Union informed Mr. Fransen that they

were calling the outstanding note signed by Automatic Handling Services, Inc. n/k/a

Machine Design Services, Inc. to be paid within 30 days.  (Fransen Dep. 19:21-20:6,

21:4-5.)  The note had been secured not only with the assets of Automatic Handling

Services, Inc. n/k/a Machine Design Services, Inc., but also with the personal assets of

Mr. Fransen, including his own home.  (See id. 20:16 21:3.)  At this point, Automatic

Handling Services, Inc. n/k/a Machine Design Services, Inc. also owed money to

Automatic Handling International for the use of its intellectual property.  (See id. 21:11-

21.)  Because of the outstanding payments owed to Mr. Pienta, and because of the

financial straits faced by himself and Automatic Handling Services, Inc. n/k/a Machine

Design Services, Inc., Mr. Fransen consulted Mr. Pienta for advice.  (See id. 21:23-22:8.

"I had asked Mr. Pienta, I guess more as friends than business people, what, you know,

what do I do?  What can the bank take from me?  You know, I mean, obviously I was

scared, and I was looking for his advice.")

Mr. Fransen and the other owners of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., decided to surrender the company assets back to the Community First Credit Union. David Pienta's advice had been to borrow more money, according to Mr. Fransen's testimony. (See id. 22:3-4, 7-8.) Daniel Pienta's affidavit describes the events in the following terms:

4. Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc. surrendered its assets to Community First Credit Union, its secured creditor on August 31, 2005.

5. The surrender was due to Machine Design Services, Inc. being unable to pay a loan secured by a first lien position of its assets.

6. Thereafter, Community First Credit Union sold the surrendered assets of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc. to Coastal Automation pursuant to a disposition of collateral sale [pursuant to Article 9 of the UCC].

(Pienta Aff. ¶¶ 4-6.) Mr. Fransen's testimony suggests that communications between the owners of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc. and David Pienta leading up to the surrender of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc.'s assets resulted in a plan to have Mr. Pienta buy the assets from the bank. At one point, Fransen testified that before he signed the documents surrendering the corporate assets back to the bank, he was aware that those assets would be purchased by Coastal Automation, Mr. Pienta's company. (See Fransen Dep. 22:11-23:13.) Mr. Fransen also states that Coastal Automation was "formed for the purpose of buying the surrendered assets from the bank when I lost the company [in 2005]" (See id.

14:2-6.), and that David Pienta was interested in acquiring those assets because of the backlog of Machine Design orders that had not been manufactured.  (Id. 22:23-23:1.) Later, Mr. Fransen states that he was not sure that Coastal Automation would buy the assets of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., but that he knew David Pienta "was considering it."  (Id. at 25:6-7.)

According to both Fransen and Daniel Pienta, Coastal Automation purchased the loans from Community First Credit Union which were personally guaranteed by the principals of Automatic Handling Services, Inc. n/k/a Machine Design Services, Inc., as well as a personal loan to Ronald Fransen.  (See id 23:20-24:3; Pienta Aff. ¶¶ 8, 10.)  In exchange, Mr. Fransen was to work for Coastal Automation for a period of three years, ten months of which were completed.  (See Fransen Dep. 25:23.)[6]  Mr. Fransen's testimony, and to a lesser extent Mr. Pienta's affidavit, suggest that Mr. Pienta's purchase, through Coastal Automation, LLC, of Machine Design Services' assets and the personal loan to Mr. Fransen may have formed part of an overall solution to the financial difficulties suffered by Machine Design and its principals.[7]

_____

[6]Daniel Pienta states that the purpose of Mr. Fransen's employment with Coastal Automation was "to have leverage over the individuals and ensure repayment of the notes."  (Pienta Aff. ¶ 13.)  The personal loan to Ronald Fransen has been paid back as of December 6, 2006.  (Id. ¶ 10.)

[7]Mr. Fransen's testimony is somewhat opaque on the timing of the communications between himself and Mr. Pienta regarding both the purchase of Machine Design assets by Coastal Automation and the decision to hire him on in exchange for repurchase of his personal note by Coastal Automation.  Mr. Fransen testifies that he did not know when he signed the papers to surrender corporate assets to the bank that he would be employed by Coastal Automation.  (See Fransen Dep. 24:11-18.)  The Agreement for Voluntary Surrender and Disposition of Collateral and Bill of Sale (transferring surrendered assets to Coastal Automation) were executed on the same day, August 31, 2005.  (See Defs.' Br., Ex. B, C.)  Mr.

In his affidavit, Daniel Pienta, President of Automatic Handling International, states that neither his company, nor Coastal Automation "continued the product line of Machine Design Service, Inc. which included the Model T 34 Belt Conveyor." (Pienta Aff. ¶ 11.)  Mr. Fransen's testimony conflicts with the notion that Coastal Automation made no efforts to sell the Machine Design Model T-34, because he quoted prices for the T-34 and testified that Coastal Automation offered the product line to its customers. (See Fransen Aff. 26:5-22 (indicating that none were actually sold).)

Apart from Mr. Fransen's indication that Automatic Handling, Inc. n/k/a Machine Design Services, Inc. paid David Pienta for the use of Automatic Handling International's intellectual property, his testimony does not shed light on the relationship between either Automatic Handling, Inc. n/k/a Machine Design Services, Inc. and Automatic Handling International, or between Coastal Automation and Automatic Handling International. Daniel Pienta's affidavit offers the following insight:

> 13.   Automatic Handling International employed two of the individuals that had personally guaranteed the loans [to Automatic Handling, Inc. n/k/a Machine Design Services, Inc.] for a period of 9 months in order to have leverage over the individuals and ensure the repayment of the notes.  Neither individual sold or serviced any Model T 34 Belt Conveyor after the date of surrender of assets.
>
> 14.   Coastal Automation and Automatic Handling International have different business locations, different corporate officers, and different shareholders from Automatic Handling Services n/k/a Machine Deign Service, Inc.

---

Tripodi has, however, at minimum furnished sufficient evidence to raise a genuine issue as to the existence of an overall deal.

(Pienta Aff. ¶¶ 13-14.)

B.      Procedural History

On September 26, 2007, I issued a Memorandum and Order denying defendants'
Motion to Dismiss pursuant to Rule 12(b)(6).  At that time, I determined that conversion
to a motion for summary judgment would be premature, as the parties had engaged in
only limited discovery.  See Tripodi v. Coastal Automation LLC, No. 06-4071, 2007 U.S.
Dist. LEXIS 71852, at *2 (E.D. Pa. Sept. 26, 2007).  Defendants have now moved for
summary judgment on the applicability of Pennsylvania's product line exception to the
facts of this case.

II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such
that a reasonable jury could return a verdict for the non-moving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might
affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for
informing the court of the basis for its motion and identifying those portions of the record
that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

11

**III.   DISCUSSION**

The sole issue to be decided on summary judgment is whether Automatic Handling International and Coastal Automation, LLC, through the series of acquisitions described above, fall within Pennsylvania's product line exception for the purposes of holding them strictly liable for the injury suffered by Mr. Tripodi.

A.    Pennsylvania's Product Line Exception

In general, Pennsylvania's successor liability doctrine[8] provides that "when one corporation sells or transfers its assets to a second corporation, the successor does not become liable for the debts and liabilities of the predecessor."  See, e.g., Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. 2006); LaFountain v. Webb Indus. Corp., 951 F.2d 544, 546-47 (3d Cir. 1991); see also, Polius v. Clark Equipment Company, 802 F.2d 75, 77 (3d Cir. 1986); Dawejko v. Jorgensen Steel Co., 434 A.2d 106, 110 (Pa. Super. Ct. 1981).  Mr. Tripodi invokes Pennsylvania's judicially-created product line exception to the general rule of non-liability in order to impose liability on the defendants.  See Dawejko, 434 A.2d at 110 (adopting the product line exception).

I addressed Pennsylvania law with respect to the this exception when I considered the defendants' 12(b)(6) motion:

> [W]here one corporation acquires all or substantially all the

---

[8]The parties do not dispute that Pennsylvania law applies to the plaintiff's tort claims.  Thus, the court must "follow (or predict if necessary) what the Pennsylvania Supreme Court would do and, in so doing, [ ] may rely on opinions of intermediate appellate courts."  Kradel v. Fox River Tractor Co., 308 F.3d 328, 331 n.4 (3d Cir. 2002).

> manufacturing assets of another corporation, even if exclusively
> for cash, and undertakes essentially the same manufacturing
> operation as the selling corporation, the purchasing corporation
> is strictly liable for injuries caused by defects in units of the
> same product line, even if previously manufactured and
> distributed by the selling corporation or its predecessor.

Dawejko, 434 A.2d at 110 (quoting Ramirez v. Amsted Indus. Inc., 431
A.2d 811, 825 (N.J. 1981)).  The [Dawejko] court made clear . . . that its
statement of the exception was intentionally "phrased in general terms, so
that in any particular case the court may consider whether it is just to
impose liability on the successor corporation."  Dawejko, 434 A.2d at 111.
The court also advised that "it will always be useful to consider whether the
three-part test stated in Ray v. Alad Corp., 560 P.2d 3 (Cal. 1977), has been
met."  Dawejko, 434 A.2d at 111.  In Ray v. Alad Corp., the California
Supreme Court held that successor liability should be imposed upon a
successor company if three circumstances could be shown:

> (1) the virtual destruction of the plaintiff's remedies against the
> original manufacturer caused by the successor's acquisition of
> the business, (2) the successor's ability to assume the original
> manufacturer's risk-spreading rule, and (3) the fairness of
> requiring the successor to assume a responsibility for defective
> products that was a burden necessarily attached to the original
> manufacturer's good will being enjoyed by the successor in the
> continued operation of the business.

560 P.2d at 8-9.

The Pennsylvania Superior Court revisited the product line exception
in Hill v. Trailmobile, Inc., 603 A.2d 602 (Pa. Super. Ct. 1992), and held
that the three factors in Ray were a requirement in the application of the
exception in Pennsylvania.  Id. at 606 ("The [Dawejko] court also stated
that the product line exception to the general rule of no liability for
successor corporations may only be applied when the following three
circumstances have each been established: [listing the three Ray factors].")
(emphasis omitted).  The Third Circuit recently acknowledged this change
in the Pennsylvania product line exception and held that the first Ray factor
must be established in order to apply the product line exception in
Pennsylvania.  See Kradel v. Fox River Tractor Co., 308 F.3d 328, 332 (3d
Cir. 2002) ("It is thus clear that the inability to recover from an original
manufacturer is a prerequisite in Pennsylvania to the use of the product line
exception.").  See also Dale v. Webb Corp., 252 F. Supp. 2d 186, 189-90
(E.D. Pa. 2003).

13

Tripodi, 2007 U.S. Dist. LEXIS 71852, at *10-14; <u>see</u> <u>generally</u>, George W. Kuney,

<u>Successor Liability in Pennsylvania</u>, 78 Pa. Bar Ass'n Q. 160, 161-64 (2007) (discussing

the evolution of Pennsylvania's "six species" of successor liability, including of the

product line exception).

B.      Automatic Handling International

        After a thorough review of the record, I have uncovered no evidence explaining

why Automatic Handling International is named as a defendant in this case.  Daniel

Pienta states in his affidavit that Automatic Handling International is a separate entity

from both Automatic Handling Services n/k/a Machine Design Services and Coastal

Automation LLC.  (<u>See</u> Pienta Aff. ¶¶ 13-14.).  Automatic Handling International never

sold or serviced the Model T-34 belt.  (<u>Id.</u>)  The only identifiable relationship between

Automatic Handling International and this case appears to be the vague notion that the

various "Handling" companies were all owned by members of the Pienta family.

        The facts do show that intellectual property exchanged hands between Automatic

Handling International and Automatic Handling Services n/k/a Machine Design Services,

but the transaction went in the wrong direction, with Automatic Handling Services n/k/a

Machine Design Services purchasing rights to a roll handing product line *from* Automatic

Handling International.  Similarly, Daniel Pienta states that "Automatic Handling

International employed two of the individuals that had personally guaranteed the loans [to

Automatic Handling, Inc. n/k/a Machine Design Services, Inc.] for a period of 9 months

in order to have leverage over the individuals and ensure the repayment of the notes," but this arrangement bears no relevance to the successor liability issue.

Plaintiff indirectly acknowledges the weakness of his case against Automatic Handling International by failing entirely to address the pending motion for summary judgment as to that party. The facts leave little room for argument; the law provides Mr. Tripodi no remedy against Automatic Handling International. I will therefore grant the motion for summary judgment as to Automatic Handling International.

C.      Coastal Automation, LLC

Focusing on the first Ray factor ("the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business"), Plaintiff argues that the inability to recover from the original manufacturer need not be *caused by* the acquisition of the manufacturing assets by Coastal Automation, LLC.[9] Relying on Hack v. H.V.R. Parts, Inc., 742 F. Supp. 283, 285 (W.D. Pa. 1990) (sale of assets predated termination of original manufacturer by at least six months, so lack of remedy not "caused by" sale of assets), defendants argue that the plaintiff must establish that his lack of remedy is a direct result of the successor corporation's acquisition. See also, Conway v. White Trucks, Div. Of White Motor Corp., 885 F.2d 90, 97 (3d Cir. 1989) (requiring "the virtual destruction of the plaintiff's remedies against the original

---

[9]For the purposes of the present discussion, I will assume that the first sale of assets flowed directly from Motion Systems a/k/a Machine Design Services to Automatic Handling Services n/k/a Machine Design Services.

manufacturer caused by the successor's acquisition," in the context of the plaintiff's failure to exercise potential remedies against the original manufacturer in bankruptcy proceedings).

The contours of the product line exception were left deliberately undefined by the Dawejko court, but Kradel resolved one question raised here, despite plaintiff's protestations to the contrary: Hill made the Ray factors prerequisites to application of the product line exception.  See Kradel, 308 F.3d at 332 ("While Hill arguably read more into Dawejko than is there, it nevertheless elevated the Ray factors into prerequisites for the product line exception.")

Since Kradel, courts in this district have grappled with whether the causation requirement is an "essential element" of the first Ray factor, without reaching a consensus.  See, e.g., Dale v. Webb Corp., 252 F.Supp.2d at 192-93 (predicting that the Supreme Court of Pennsylvania would require causation as an essential element of the first Ray factor); Mitchell v. Powermatic Corp., 2004 U.S. Dist.  LEXIS 2450 (E.D. Pa. 2004) (calling the causation requirement "a wrinkle in the analysis of this factor that has yet to be addressed by either the Pennsylvania Supreme Court or the Third Circuit").  If causation is a requirement, then, at a minimum, the Article 9 sale of Automatic Handling Service n/k/a Machine Design Service's assets to Coastal Automation, LLC would bar recovery under the product line exception.

The purpose of extending product liability to corporate successors under certain

16

conditions is to preserve the rights of third parties and promote loss spreading.  See, e.g.,

Dawejko, 290 Pa. Super at 22 ("[T]he paramount policy to be promoted by the rule [of

strict liability] is the protection of otherwise defenseless victims of manufacturing defects

and the *spreading throughout society* of the cost of compensating them.") (emphasis in

original; internal quotation omitted); Ray, 560 P.2d at 8-9 (naming the relevant factors for

imposing liability, given the "paramount policy" of victim protection and loss spreading);

see also Berg Chilling Systems, Inc. v Hull Corp., 435 F.3d 455, 469 (3d Cir. 2006) ("The

objective of the [continuity of stock ownership] requirement [for applying the so-called

"continuity exception"] is usually to identify situations in which shareholders of a seller

corporation unfairly attempt to impose their costs or misdeeds on third parties by

retaining assets that have been artificially cleansed of liability.")

I will decline to apply the product line exception in this case.  When Automatic

Handling Services n/k/a Machine Design Services surrendered its assets to Community

First Credit Union, plaintiff's potential remedy against that entity was eliminated.  The

subsequent sale by the bank to Coastal Automation, LLC, even if known to the principals

of both companies before surrender of assets, does not raise the policy concerns

animating the product line exception.  Regarding the causation requirement in the first

Ray factor, I am persuaded that the sale of manufacturing assets and the destruction of

plaintiff's remedy must at least display a species of unfairness to the plaintiff that is not

presented when the original manufacturer collapses and must surrender its assets to a

bank.  Without adopting a strict causation requirement as defendants advocate, it is clear to me that the court's task is to identify those situations in which corporate actors unfairly and often deliberately abuse the corporate form to shift or eliminate liabilities, rather than spreading the costs of those liabilities throughout society and compensating victims of manufacturing defects.  Berg Chilling Systems, Inc. v Hull Corp., 435 F.3d 455, 469.  In this case, the surrender of assets occurred for reasons unrelated to the companies' liability for defective products.  I will therefore grant summary judgment in favor of Coastal Automation, LLC.

**IV.    CONCLUSION**

Based on the foregoing discussion, I will grant defendants' motion.  An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM TRIPODI, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 06-4071 |
| | : | |
| COASTAL AUTOMATION LLC, | : | |
| AND MACHINE DESIGN SERVICE | : | |
| INT'L, AND AUTOMATIC | : | |
| HANDING INT'L, AND MACHINE | : | |
| DESIGN SERVICE, INC., | : | |
| Defendants | : | |

## <u>O R D E R</u>

**STENGEL, J.**

**AND NOW**, this 31st day of July, 2008, upon consideration of defendants' Motion

for Summary Judgment (Document #23), it is hereby **ORDERED** that:

(1)     Defendants' Motion for Summary Judgment is hereby **GRANTED**.

(3)     The Clerk is directed to mark this case **CLOSED** for all purposes.

BY THE COURT:

 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM TRIPODI,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 06-4071** |
| | : | |
| **COASTAL AUTOMATION LLC,** | : | |
| **AND MACHINE DESIGN SERVICE** | : | |
| **INT'L, AND AUTOMATIC** | : | |
| **HANDING INT'L, AND MACHINE** | : | |
| **DESIGN SERVICE, INC.,** | : | |
| **Defendants** | : | |

# O R D E R   O F   J U D G M E N T

**STENGEL, J.**

     **AND NOW**, this 31st day of July, 2008, in accordance with my Order granting the

defendant's Motion for Summary Judgment, and in accordance with Federal Rule of Civil

Procedure 58, judgment is hereby entered on behalf of the defendants, Automatic

Handling International and Coastal Automation, LLC, and against the plaintiff.

                                         BY THE COURT:


                                     /s/ Lawrence F. Stengel
                                     LAWRENCE F. STENGEL, J.